IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:11CR165 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | FINDINGS AND |
| | ) | |
| ROCIO CHAVEZ, | ) | RECOMMENDATION |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the Motion to Dismiss (Filing No. 26) and Motion to Suppress Evidence (Filing No. 27) filed by the defendant Rocio Chavez (Chavez). Chavez is charged in the Indictment with the false representation of a Social Security number not assigned to her with the intent to deceive (Count I), in violation of 42 U.S.C. § 408(a)(7)(B); the use of identification documents, knowing such documents were not lawfully issued for her use, for the purpose of satisfying a requirement of employment (Count II), in violation of 18 U.S.C. § 1546(b); and the false claim of United States citizenship (Count III), in violation of 18 U.S.C. § 911. See Filing No. 1. Chavez seeks an order dismissing the charges against her based on the delay between her arrest and first appearance before a magistrate judge. See Filing No. 26. Chavez also seeks to suppress all evidence found in her purse, or stemming from the discovery of documents in her purse, after it was seized by law enforcement on May 3, 2011, in Omaha, Nebraska. See Filing No. 27.

An evidentiary hearing was held on Chavez's motions on August 25, 2011. Chavez was present for the hearing along with her retained counsel, Joshua W. Weir. The United States was represented by Assistant United States Attorney Frederick D. Franklin. Javier Villalobos, a certified Spanish language interpreter, served as the interpreter for the hearing. During the hearing, the court heard the testimony of United States Immigration and Customs Enforcement (ICE) Special Agent Zachary Wimer (Agent Wimer). A transcript (TR.) of the hearing was prepared and filed on August 30, 2011 (Filing No. 39).

**FINDINGS OF FACT**

On January 18, 2011, an ICE auditor sent notice to Nebraska Beef, Inc., that Homeland Security intended to conduct an inspection of Nebraska Beef's employee I-9 forms (TR. 6). An inspection was performed of 972 I-9 forms provided by Nebraska Beef. (TR. 22). Of the inspected forms, 178 Nebraska Beef employees were identified as having suspect documents (TR. 22; Ex. 102). Fourteen of those individuals were identified as having a social security number that also had a Federal Trade Commission identity theft complaint (TR. 7-8,22). Agent Wimer suspected these fourteen individuals of committing identity theft (TR. 22-23).

On May 3, 2011, in coordination with ICE, Nebraska Beef gathered the fourteen employees suspected of identity theft into a meeting room (TR. 23). Fifteen to seventeen agents participated in making contact with and attempting to interview the identified employees (TR. 8-9). Agent Wimer was assigned to make contact with an employee using the name Gloria Blanco who had been identified as using a social security number that had been report to the FTC for improper use (TR. 7-8). The employee identified as Gloria Blanco did not speak English (TR. 12). Agent Jeff Stork, who spoke Spanish, assisted Agent Wimer (TR. 10-11). When Agent Stork asked the employee identified as Gloria Blanco her name, she stated she did not want to talk to the agents without first speaking to an attorney (TR. 11). At the conclusion of all of the interviews at the Nebraska Beef facility, the individuals were asked, in Spanish, if they would like to take their personal belongings, those contained in their employee lockers, with them (TR. 11, 13). Some of the individuals obtained their personal belongings; the employee identified as Gloria Blanco did not respond when asked if she wanted her belongings (TR. 11, 13, 46).

The fourteen interviewed employees were placed under arrest (TR. 12). Agent Wimer suspected the employee identified as Gloria Blanco was someone else using the Gloria Blanco name to work (TR. 12). Agent Wimer suspected she was an illegal alien because she did not speak English, refused to answer any questions about her name, and was using a name associated with an identity theft complaint (TR. 12). Agent Wimer decided to administratively arrest the individual and detain her for further investigation

about her identity (TR. 12, 28-29). Agent Wimer also thought the agents had probable cause to arrest the individual for the criminal felony offense of identity theft (TR. 27-28).

All fourteen of the interviewed employees were transported to the ICE district office in Omaha for processing (TR. 13-14). Processing entails additional interviews, taking fingerprints, entering data about the individuals into a database, and initiating removal proceedings, if appropriate (TR. 14-15). Agent Wimer obtained fingerprints from the employee identified as Gloria Blanco and determined she had never been processed by the automated biometric fingerprint system (TR. 15-16). Agent Wimer was not able to determine her true identity (TR. 15-16).

Agent Wimer contacted a manager at the Nebraska Beef facility and asked him about the company's policy with regard to the unclaimed personal belongings left at the facility (TR. 16-17). The Nebraska Beef facility has an unwritten policy to remove, store, and ultimately discard unclaimed items from former employees' lockers on a monthly basis (TR. 19). Specifically, Agent Wimer asked if the manager was going to retrieve the items from Gloria Blanco's employee locker (TR. 16-17). The manager replied that he was (TR. 17). Agent Wimer asked if he could inspect the items prior to disposal (TR. 17). The manager replied that Agent Wimer could do so (TR. 17). Agent Wimer returned to the Nebraska Beef facility where the manager retrieved the items and gave them to Agent Wimer (TR. 17). The manager gave Agent Wimer a large purse (TR. 18). The manager's conduct was a deviation from Nebraska Beef policy (TR. 19).

Chavez did not give her consent for a search or seizure of her employee locker or any personal belongings (TR. 24-25). There is no evidence Chavez denied ownership of the purse. The purse contained, among other things, a state of California benefits card in the name of Rocio Chavez, with a date of birth; a Nebraska identification card in the name of Gloria Blanco; and an Omaha Public Schools (OPS) business card for a bilingual representative at an elementary school (TR. 18). Agent Wimer contacted the OPS representative to identify the person in the Nebraska identification card picture (TR. 20-21). The OPS representative identified the person as "Rocio," but her last name was unknown (TR. 21). From that time, Agent Wimer believed the employee identified as Gloria Blanco

was actually Rocio Chavez, the defendant (TR. 21). Agent Wimer processed the defendant for removal proceedings and placed her without bond in jail (TR. 33-34, 36).

On May 5, 2011, Agent Wimer forwarded his information about Chavez to the United States Attorney's Office as a referral for prosecution on three felony charges (TR. 32). On May 20, 2011, Chavez was indicted in the instant matter. **See** Filing No. 1. On May 27, 2011, the undersigned magistrate judge held an initial appearance and arraignment for the defendant on these charges. **See** Filing No. 10 - Text Entry.

## LEGAL ANALYSIS

As an initial matter, Chavez argues the charges against her should be dismissed as a remedy for the government's failure to bring her before a judicial officer within forty-eight hours and without unnecessary delay. In the alternative, Chavez seeks to suppress all evidence obtained from the seizure of her purse from her employee locker and the search of the purse. Furthermore, Chavez contends the OPS representative's identification should be suppressed as fruit of the illegal search and seizure. In response, the United States argues the Chavez was placed under an administrative arrest, rather than a criminal arrest, such that the arrest did not trigger statutory requirement for her to be brought before a judicial officer. Second, the United States argues Agent Wimer received Chavez's purse from a third-party who possessed a common authority over the employee locker, such that the search and seizure do not violate Chavez's constitutional rights.

### A.   Motion to Dismiss

Federal statute authorized an ICE agent to place an individual under arrest without a warrant under specific circumstances. **See** 8 U.S.C. § 1357. The circumstances of the arrest determines the process due. An ICE agent has the authority

> to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any [law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens] and is likely to escape before a warrant can be obtained for his arrest, but ***the alien arrested shall be taken without unnecessary delay for examination before an officer of the***

> ***Service having authority to examine aliens*** as to their right to enter or remain in the United States. . . .

8 U.S.C. § 1357(a)(2) (emphasis added).

An ICE agent also has the authority to make felony arrests related to specific crimes, that is

> to make arrests for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens, if he has reason to believe that the person so arrested is guilty of such felony and if there is likelihood of the person escaping before a warrant can be obtained for his arrest, but ***the person arrested shall be taken without unnecessary delay before the nearest available officer empowered to commit persons charged with offenses*** against the laws of the United States. . . .

8 U.S.C. § 1357(a)(4) (emphasis added).

Similarly, an ICE agent has the authority, generally, to make arrests "for ***any*** felony cognizable under the laws of the United States, if the officer or employee has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony." 8 U.S.C. § 1357(a)(5) (emphasis added). Subsection (a)(5) does not contain the same requirement for unnecessary delay. However, Rule 5(a) of the Federal Rules of Criminal Procedure provides: "A person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer as Rule 5(c) provides, unless a statute provides otherwise." Fed. R. Crim. P. 5(a)(1)(A). Moreover, "persons arrested without a warrant must promptly be brought before a neutral magistrate for a judicial determination of probable cause." *County of Riverside v. McLaughlin*, 500 U.S. 44, 53 (1991). "[A] jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement." *Id.* at 56. A longer delay, even if occasioned by intervening weekends or a holiday, is "not immune from systemic challenges." *Id.* at 58-59.

In this case, Agent Wimer initially arrested Chavez based on probable cause that she had committed the crime of identity theft. At the same time, Agent Wimer had reasonable suspicion to detain Chavez as an illegal alien. For that reason, Agent Wimer

5

continued his investigation into Chavez's identity and legal status in the United States. **See** *United States v. Encarnacion*, 239 F.3d 395, 398-99 (1st Cir. 2001) (noting that "[f]rom the moment he was stopped, . . . the INS was required by law to determine whether [the defendant's] application to enter the country was valid, and to this end, it immediately put into motion the administrative process of determining [the defendant's] status"). Within a couple hours, Agent Wimer determined Chavez's identity and determined she was subject to deportation proceedings. "Because arrests under § 1357(a)(2) for the purpose of deporting an illegal alien result in 'civil' or 'administrative' removal proceedings, aliens held in that type of custody are not entitled to the protections of Rule 5(a) of the Federal Rules of Criminal Procedure." *United States v. Quintana*, 623 F.3d 1237, 1240 n.1 (8th Cir. 2010). Despite the fact of Chavez's earlier (or contemporaneous) arrest for identity theft, she was not entitled to the protections of Rule 5(a), as her arrest and detention on the status offense were civil and nonpretextual. **See** *Encarnacion*, 239 F.3d at 400. Accordingly, Chavez's motion to dismiss should be denied.

**B.    Search and Seizure of Purse**

The Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *U.S. Const. amend. IV*; **see** *United States v. Ameling*, 328 F.3d 443, 447 (8th Cir. 2003) (Fourth Amendment applies to the states through the Fourteenth Amendment.). "While the Fourth Amendment does not permit warrantless searches, law enforcement may conduct such a search if they obtain a resident's voluntary consent." *United States v. Quintero*, 648 F.3d 660, 667 (8th Cir. 2011). There is no dispute, Chavez did not give her consent for either the search or seizure of her purse.

The government argues Chavez's employee locker was not searched, nor the items seized, by law enforcement (TR. 53). Rather, the government argues the management official at the Nebraska Beef facility voluntarily obtained the items from the employee locker and gave those items to law enforcement, without "government involvement" (TR. 54). **See** Filing No. 33 - Brief p. 4 (**citing** *United States v. Matlock*, 415 U.S. 164, 170-71 (1974) ("[T]he consent of one who possesses common authority over [or other sufficient

relationship to] premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared.")). For this reason, the government asserts, "Under the totality of the circumstances here, the agents acted reasonably in believing that it was lawful for them to accept from manamgement [sic] of Nebraska Beef the personal belongings of an individual they had detained and that they had valid consent to search the items retrieved from the defendant's locker." Filing No. 33 - Brief p. 4.

> Consent to search . . . may be given either by the suspect or by some other person who has common authority over, or sufficient relationship to, the item to be searched. "Common authority" is determined by mutual use, joint access, and control, and is a question of fact. An officer cannot rely on a third party's consent to intentionally bypass a person who is present, has a superior privacy interest in the premises, and actively objects to the search. However, a search is lawful where officers reasonably rely on the consent of a third party who demonstrates apparent authority to authorize the search, even if the third party lacks common authority. Apparent authority is present when the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the thing searched.

*United States v. Munoz*, 590 F.3d 916, (8th Cir. 2010) (internal quotations and citations omitted); **see** *United States v. Welch*, 4 F.3d 761, 764 (9th Cir. 1993) (holding that one occupant of rental car did not have the authority to consent to the search of another occupant's purse where there was no evidence of joint access to or shared control over it), overruled on other grounds by *United States v. Kim*, 105 F.3d 1579, 1580–81 (9th Cir. 1997).

     Assuming, Nebraska Beef management could give consent for law enforcement to search the employee's locker and seize the items contained in the locker, Nebraska Beef management clearly had no authority to consent to a search of Chavez's purse. Agent Wimer did not reasonably believe that Nebraska Beef management had authority to consent to the search of the purse. Although management may have had joint access to the purse, to some extent, no reasonable person would believe management had shared control over the purse and its contents. Agent Wimer assumed the purse belonged to Chavez and knew Chavez did not give consent with regard to its search or seizure.

Furthermore, no reasonable person would believe Chavez had abandoned her purse merely because she left the purse in the employee locker when arrested. Because Chavez did not consent to the search of her purse, her Fourth Amendment rights were violated by the warrantless search.

Agent Wimer's interview of the OPS representative and the information gained from her stemmed from the illegal search. The exclusionary rule also applies to evidence, tangible and testimonial, which was derived, directly or indirectly, from unconstitutionally obtained evidence, i.e., the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 487 (1963). The government fails to show any exception to the exclusionary rule applies in this case. Accordingly, Chavez's motion to suppress should be granted with regard to the evidence obtained from the illegal search of her purse and evidence derived from such search. Upon consideration,

**IT IS RECOMMENDED TO JUDGE LYLE E. STROM that:**

1. Rocio Chavez's Motion to Dismiss (Filing No. 26) be denied.
2. Rocio Chavez's Motion to Suppress Evidence (Filing No. 27) be granted.

**ADMONITION**

Pursuant to NECrimR 59.2 any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 3rd day of October, 2011.

BY THE COURT:<br>
s/ Thomas D. Thalken<br>
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.